IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUNG KUN KIM,                          )
                                       )
         Plaintiff                     )
                                       )
    v.                                 )      1:11cv1370(LMB/TCB)
                                       )
LEON E. PANETTA, Secretary,            )
United States Department of            )
Defense,                               )
                                       )
         Defendant.                    )

FILED

AUG 2 1 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### MEMORANDUM OPINION

Plaintiff Dr. Sung Kun Kim ("Kim" or "plaintiff") has filed this civil action against the Secretary of the Department of Defense ("the Secretary" or "defendant") in his official capacity, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq. Before the Court is the Secretary's Motion for Summary Judgment ("Motion"), which has been fully briefed and argued by the parties. For the reasons discussed below, the Secretary's Motion will be granted.

### I.    BACKGROUND

#### A. Plaintiff's Employment

Plaintiff is a Korean-born, naturalized United States citizen who received BS and MS degrees in civil engineering from Kansas State University and a PhD in structural engineering from the University of Maryland. Pl.'s Opp'n Def.'s Mot. Summ. J.

("Pl.'s Opp'n"), Ex. 2 ¶¶ 2-3. After working for nine months as a structural engineer ("SE") with the Pentagon Force Protection Agency ("PFPA"), plaintiff was hired as an SE for the Department of Defense's ("DOD") Defense Threat Reduction Agency ("DTRA") on June 25, 2006. See Pl.'s Opp'n, Ex. 22; Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex. 1. Within the DTRA, plaintiff was assigned to the Joint Staff Integrated Vulnerability Assessments ("JSIVA") team and specifically to JSIVA Team 2 led by Colonel Timothy Sherwood ("Sherwood").

As an SE, plaintiff was required, among other things, to analyze the structural engineering requirements of military installations in light of potential methods of terrorist attack, and to participate in providing a security assessment of the installations. See Def.'s Mem., Ex. 1 at 11-13 (SE job description). On July 7, 2006, plaintiff signed his Performance Plan, which contained four objectives. The first objective required plaintiff to complete certain training requirements and to become certified to conduct assessments by September 1, 2006. See id. at 15-17.[1] Later in July, plaintiff attended introductory training in Kansas, which included observing an assessment.

---

[1] In his civil complaint and his testimony before the Merit Systems Protection Board, plaintiff asserted that he was unaware he would have to become certified for the DTRA position and seemed to suggest that others did not have to become certified. See, e.g., Compl. ¶ 31. Any claim that the certification requirement was an act of retaliation is defeated by the

From August 6 to 18, 2006, plaintiff engaged in his first certification attempt in Germany. During the certification attempt, plaintiff observed an assessment during his first week and then conducted an assessment under his trainer William Hudson ("Hudson"), who was an SE and deputy chief of JSIVA Team 6.[2] Hudson was the first person in this record to express serious and highly specific criticisms of plaintiff's performance, and he did not recommend certification. His reasons for this decision included plaintiff's perceived lack of engagement and personal attacks on Hudson as well as his failure to prepare, incorporate feedback into his work, and bring the proper tools, all of which Hudson described in an email to Captain John F. Murphy ("Captain John Murphy"). See id., Ex. 7 at 1.

Hudson recommended that plaintiff be allowed to attend classroom instruction to learn the JSIVA model "which may . . . be quite different from the work he did at PFPA." Id. at 2. Team chief Captain Charles Vaughan ("Vaughan") concurred with

---

evidence. Specifically, Kim signed his Performance Plan requiring him to obtain certification fewer than two weeks after he was hired at DTRA and about six weeks before he engaged in any protected activity. Moreover, the record establishes that certification was a standard requirement for all SEs.

[2] The Secretary describes the certification process as "see one; do one." It is standard practice to allow the SE to observe during the first week before having to conduct an assessment the second week.

3

Hudson's review, and plaintiff was not certified. See Pl.'s Opp'n, Ex. 17.

On August 23, 2006, Captain John Murphy issued plaintiff his first performance counseling memorandum, providing a detailed list of reasons that plaintiff's performance had to that point been "unsatisfactory." See Def.'s Mem., Ex. 1 at 28-30. The memorandum indicated that plaintiff would be placed on a remedial training plan and assisted by SE Ramesh Sheth ("Sheth") and that the "entire organization [was] willing to help [him] attain certification." Id. at 29-30. From September 18 to 22, 2006, plaintiff participated in remedial, one-on-one training at Eglin Air Force Base in Florida, which he completed "successfully." Id. at 3, 31.

Plaintiff then attended more "complex" training at Fort Belvoir from October 1 to 6, 2006. Sheth reported that plaintiff's performance there was a "different story" from how he had done at Eglin Air Force Base. Id. at 31-32. Specifically, Sheth wrote to Captain John Murphy and Marion Andrews ("Andrews"), the chief of the Combat Support Assessments Division, Support Branch ("CSAS"), that plaintiff did not bring the necessary materials, was tired and unfocused, left early, was non-responsive to questions, possibly as a result of his failure to listen, and offered long answers with unrelated information. Id. ("Sung's work habit added extra burden to [his]

trainer."). Nevertheless, Sheth still expressed optimism that "upon improving on above mentioned critical items, Sung will be able to serve his team in a better and a professional manner during a certification process." Id. at 32.

On October 11, 2006, JSIVA Team 2's team chief, Sherwood, sent plaintiff a memorandum entitled "counseling input," identifying a few "areas to sustain" and a significant number of "areas for improvement." Id. at 61-64. Concerns with Kim's follow-through, focus during presentations, refusal to consider criticism, professional appearance, and inability to weed out extraneous detail, among other issues, were raised. Id. On October 12, 2006, Captain John Murphy issued plaintiff a second performance counseling memorandum, which incorporated feedback from Hudson, Sheth, and Sherwood. The memorandum stated that plaintiff had not met the first objective from the July 7, 2006 Performance Plan and was "not satisfactorily performing to standards for Objects 2 and 4." Id. at 33. The memorandum observed "progress in a few areas but a number of critical deficiencies remain." Id.

Plaintiff engaged in his second certification attempt in Portsmouth and Yorktown, Virginia between October 22 and 27, 2006 and between October 29 and November 3, 2006. The certification team this time consisted of Sheth, who was the trainer, and Week 1 team chief Captain Kevin McCarthy

("McCarthy"), and Week 2 team chief Colonel James Murphy ("Colonel Jim Murphy"). See Def.'s Mem. at 5. Although Sheth recommended certifying plaintiff, he expressed numerous qualifications that the Secretary characterizes as "serious." See id., Ex. 1 at 41. The ultimate decision on whether to certify rested with team chiefs McCarthy and Colonel Jim Murphy. See Def.'s Mem. at 5; see also Kim v. DOD, 2008 MSPB Lexis 1510, at *34-36 (MSPB Mar. 17, 2008), aff'd, 328 F. App'x 663 (Fed. Cir. 2009)(per curiam). After being asked by Captain John Murphy whether he wished to certify plaintiff, Colonel Jim Murphy wrote, "I would be hesitant to sign [certification paperwork]. In a perfect world I would not sign. He is a 'C' performer, at best. . . . If you NEED to get him out on the road then I'll sign, but please keep in mind that he will need a lot of oversight, at least for the first several assessments." See Pl.'s Opp'n, Ex. 10 & 11 (emphasis in original). After discussions among Sheth, the team chiefs, and Captain John Murphy, plaintiff was not certified.

On December 27, 2006, plaintiff received his third performance counseling memorandum, in which Sherwood conveyed "concern[] about [Kim's] performance and potential on Team Two" and stated that, although he would not seek reassignment at this juncture, plaintiff's poor performance to date justified such action. See Def.'s Mem., Ex. 1 at 65. The problems identified

6

included, but were not limited to, plaintiff's failures to become certified, meet deadlines and submit completely accurate reports and financial documents. Id. at 67 ("Although I do not believe you deliberately tried to defraud the government, your negligence would have done so . . . I will not tolerate further inaccuracies on either team reports or on fiscal documents."). Plaintiff also received revised performance objectives on that date. The first three were substantially the same as those in his original Performance Plan, but the fourth objective included new elements, such as team work, better awareness and coordination, and some collateral duties. See Def.'s Mem. at 9 n.1; id., Ex. 1 at 1, 18-21.

On January 8, 2007, plaintiff received an interim performance appraisal regarding his progress toward meeting the four Performance Plan objectives, in which Captain John Murphy recognized a "tendency toward stubbornness and being dismissive, which detract from team building and interpersonal relationships" and the absence of "a solid understanding of JSIVA fundamentals and benchmarks," but he also observed a "renewed determination and initiative" with respect to becoming certified and expressed his belief that Kim had "the potential to be a solid JSIVA" SE. Id., Ex. 1 at 60.

From January 21 to February 2, 2007, plaintiff engaged in his third certification attempt in Charleston and Parris Island,

South Carolina. Id. at 4. He was given a different trainer, SE
Anthony DiSalvo ("DiSalvo"), for the first week. In a detailed,
nine-page memorandum, DiSalvo expressed significant criticisms
of Kim's performance, including that plaintiff took an entire
week to complete the simplest site assessment and that he was
unsure how Kim would do on a larger installation. Id. at 42-50.
He added that Kim appeared disinterested in the training
materials. Id. DiSalvo ultimately judged plaintiff "acceptable
with reservations" but did not make a recommendation as to
certification. Id. at 48.

On February 16, 2007, plaintiff initiated his first contact
with DTRA's Equal Employment Opportunity ("EEO") office, where
he spoke to an EEO counselor. Id., Ex. 12 ¶ 3 (MiChele Stevenson
Decl.); id., Ex. 13 (Glenn Budd Decl.). According to the EEO
counselor with whom he spoke, Kim "felt [his issue] may be a
hostile work environment issue or a cultural issue, as in
military versus civilian." Id., Ex. 12 ¶ 3. Kim was then
"provided . . . with the descriptions of the bases on which an
employee can file a discrimination complaint under the EEO
regulations, such as race, sex, national origin, and religion.
Dr. Kim was not sure if any of the bases were applicable, and
stated he would get back to [the EEO counselor] after the
weekend." Id. Plaintiff did not immediately return to the EEO
office.

Following Kim's third and final certification attempt in South Carolina, Sherwood issued plaintiff his fourth performance counseling memorandum on February 20, 2007. In the memorandum, Sherwood stated that although plaintiff's performance on some basic tasks had improved, he had not improved "sufficiently to certify [him], nor to justify the additional manhours required to train and mentor" him. Id., Ex. 1 at 51. "Although your performance, based on your pay band, should be one of the best on the team[,] it is actually substandard . . . and has at times reflected negatively on the professionalism of the organization." Id. Sherwood informed plaintiff, "I cannot certify you as" an SE and "am recommending your training program be discontinued." Id. Plaintiff acknowledged receipt of this memorandum on February 21, 2007, writing next to his signature: "Any future verbal sessions request to have an EO BE PRESENT." Id. at 59.

After plaintiff did not appear for work due to back pain, Captain John Murphy issued on February 27, 2007 a fifth and final performance counseling memorandum, in which he reminded Kim that he must notify his supervisors should he need to take sick leave or be out of the office. See id., Ex. 8. On March 1, 2007, plaintiff returned to the EEO office to make an informal EEO complaint, alleging that managers subjected him to harassment because of his race and national origin, which

created a hostile work environment, and that they retaliated against him due to his request for EEO representation at future performance counseling sessions. Id., Ex. 14. The informal complaint eventually resulted in an "EEO Counselor's Report." Id.

On March 2, 2007, Captain John Murphy issued a memorandum titled "Unsatisfactory Performance," in which he advised plaintiff that due to six to eight months of negative reports from SE trainers and team chiefs, his own observations of plaintiff's performance, and plaintiff's failure to get certified, he would be working with human resources "to develop a proposal to remove" him from his position. See id., Ex. 1 at 70-71. He noted that plaintiff had "been in the training syllabus for nearly four times longer than it usually takes" and concluded that plaintiff did not have the requisite skill set to perform as a JSIVA SE. Id.

Through counsel, plaintiff filed a formal Complaint of Discrimination on April 12, 2007, alleging hostile work environment, disparate treatment, and retaliation. Id., Ex. 15. On May 2, 2007, Captain John Murphy issued a Notice of Proposed Removal ("Notice") in which plaintiff was informed that his termination was "being proposed for unsatisfactory performance." Id., Ex. 1 at 1-6. The Notice identified eight time periods in which plaintiff received training or intensive mentoring and

10

eight dates between August 2006 and February 2007 on which plaintiff was counseled due to his inadequate performance. Finally, the Notice advised plaintiff that he could file a written or oral response and that he would have the right to appeal an adverse decision. Id. at 6.

Following receipt of the Notice, plaintiff, through counsel, submitted a written reply on May 31, 2007, objecting to the proposed termination on the grounds that he was treated unfairly and waiving his right to oral argument. See id., Ex. 9. On August 28, 2007, after considering Captain John Murphy's Notice and plaintiff's written reply, McCarthy issued DTRA's final decision to remove plaintiff from federal service for unsatisfactory performance, effective September 1, 2007. Id., Ex. 10.

## B. Subsequent Administrative Proceedings

On September 10, 2007, plaintiff, through counsel, appealed McCarthy's decision to remove him from federal service to the Merit Systems Protection Board ("MSPB"), which is an independent executive branch agency that hears employment-related appeals from certain agency actions. During the MSPB proceedings, the parties engaged in discovery on issues related to plaintiff's termination as well as his affirmative defenses of discrimination and retaliation, which he raised in opposition to

his removal.[3]

In a lengthy written opinion, issued on March 17, 2008, and discussed further below, an administrative judge affirmed the DTRA's decision to remove Kim from federal service. Id., Ex. 2. Kim filed a petition for review asking the MPSB to reconsider the March 17, 2008 decision, but that petition was denied. Id., Ex. 21 ("After fully considering the filings in this appeal, we conclude that there is no new, previously unavailable evidence and that the administrative judge made no error in law or regulation that affects the outcome."). The Federal Circuit issued a per curiam opinion affirming the MSPB on July 14, 2009. Id.

While the MPSB was considering plaintiff's termination, the EEO office conducted an investigation into Kim's April 12, 2007 formal Complaint of Discrimination, and on October 4, 2007, it issued a Report of Investigation ("ROI"). Finding on the basis of the ROI that plaintiff had not alleged a prima facie case of discrimination or retaliation, the DTRA issued a Final Agency Decision ("FAD") to this effect on October 9, 2008. See Reply Mem. of Law Supp. Def.'s Mot. Summ. J. ("Def.'s Reply"), Ex. 22;

---

[3] Although the MSPB does not decide stand-alone discrimination claims, which are the province of the EEOC, it will hear such claims when they are related to an appeal of a notice of removal, over which the MPSB does have jurisdiction. Because Kim's discrimination and retaliation claims were raised as affirmative defenses to his termination, the MSPB properly considered them.

Def.'s Mem., Ex. 17. The FAD also found that even had plaintiff satisfied the requirements for a prima facie case, legitimate non-discriminatory reasons for plaintiff's removal had been articulated by the DTRA; it found, moreover, that "there is nothing in the record to support any prior EEO activity on his part that would form the basis for his claim of reprisal as defined by EEO regulations." See Def.'s Mem., Ex. 17 at 5-6. Plaintiff filed a timely appeal to the Equal Employment Opportunity Commission ("EEOC"), which affirmed the conclusions reached in the FAD on October 4, 2011.

On December 19, 2011, plaintiff filed a two-count complaint alleging discrimination based on race and national origin (Count II) and retaliation (Count I).

## II. DISCUSSION

The Secretary filed his Motion for Summary Judgment shortly after the Court's Scheduling Order issued and after the parties filed a proposed joint discovery plan. He argues that, given the extensive previous administrative proceedings, no further discovery is needed to show that plaintiff cannot succeed on either his discrimination or retaliation claims and that defendant should prevail on the Motion. The Court will first consider the appropriateness of considering summary judgment before the close of discovery, and then whether a reasonable

trier of fact could find that Kim was the subject of discriminatory or retaliatory treatment by defendant.

## A. Plaintiff's Rule 56(d) Motion

Arguing that the Secretary "moved for summary judgment before Plaintiff had opportunity to benefit from discovery," Kim requests a continuance. Pl.'s Opp'n at 23-24. Defendant responds that no further discovery is warranted given the voluminous record developed during proceedings before the DTRA's EEO office, the EEOC, and the MSPB, which together "result[ed] in 891 pages of deposition testimony." Def.'s Mem. at 1. Despite all the evidence that was produced, plaintiff is unable to identify a single material fact that creates a genuine dispute. See Def.'s Reply at 18.

A court may defer ruling on a motion for summary judgment, or deny the motion altogether, to permit further discovery if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).[4] "As a general rule, summary judgment is appropriate only after 'adequate time for discovery,'" Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)), and "must be refused where the nonmoving

---

[4] Although the parties' arguments and citations reference Fed. R. Civ. P. 56(f), the operative provision at issue is Rule 56(d), a change occasioned by the 2010 amendments to the federal rules.

party has not had the opportunity to discover information that is essential to his opposition," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986).

Limiting discovery may be permissible, however, where "reliable pre-existing sources" of evidence allow a court to avoid duplicative efforts "from which the court could realistically expect to gain little but cumulative insight." See Newsom v. Barnhart, 116 F. App'x 429, 432 (4th Cir. 2004)(quoting Thigpen v. United States, 800 F.2d 393, 397 (4th Cir. 1986))("Given the breadth of the administrative record, we cannot find an abuse of discretion in the district court's refusal to permit further discovery.").

Plaintiff "is confident" that "if allowed discovery," he "will have additional documentation concerning disputed issues of fact." Pl.'s Opp'n at 3. Yet the areas in which he seeks discovery are precisely those covered by prior EEO, EEOC, and MSPB proceedings. See Boyd v. Guiterrez, 214 F. App'x 322, 323 (4th Cir. 2007)(per curiam)("Given the extent to which numerous documents and affidavits submitted during his EEOC proceedings were already available to [plaintiff], we find no abuse of the district court's discretion in denying [his] Rule 56(f) motion."). For example, plaintiff seeks discovery into the "pattern and practice of discrimination in the office"; "documents concerning discriminatory or retaliatory motive,

including emails sought by Plaintiff in his pending discovery requests"; and alleged irregularities in the certification process, including his belief that Colonel Jim Murphy should have had "no official role" in the process. See Pl.'s Opp'n at 3-6; id., Ex. 1 (counsel's Rule 56(d) affidavit).

Each of these subject areas was within the scope of the MSPB and EEO/EEOC proceedings. Represented by counsel throughout the administrative process, plaintiff explicitly raised, as affirmative defenses to his termination, "race and national origin discrimination, retaliation for protected EEO activity, and violations of due process." See Kim, 2008 MSPB Lexis 1510, at *2. Finding that plaintiff ultimately "presented no evidence in support of [his discrimination] allegation" and that his claims were actually "undermined by the evidence of record," the MSPB rejected those affirmative defenses, observing that other foreign-born engineers were employed by DTRA and had been certified. See id. at *55-60. It was also "undisputed," according to the MSPB, that Captain John Murphy, who proposed plaintiff's removal from federal service, had approved plaintiff's selection for the SE position the year before. See id.; see also Def.'s Reply, Ex. 22.[5]

---

[5] Plaintiff now disputes this fact but offers no evidence to contradict the MSPB's factual finding.

16

The record shows that plaintiff had full opportunity to take discovery on his affirmative defenses. In particular, in his response to the MSPB's "Affirmative Defense Order," Kim responded by "not[ing] that discovery is still ongoing and that additional evidence and information supporting his affirmative defenses may be revealed." Def.'s Reply, Ex. 23 (plaintiff representing that he was awaiting transcripts of depositions already taken and "there are several depositions scheduled to be taken, including those of the proposing official and deciding official"). Copies of Kim's first and second requests for production of documents, which sought notes, outlines, and emails "written or received" in a two-year period, his sets of interrogatories, and his notices of deposition all show that the information plaintiff now seeks is precisely what he sought during the administrative process. See Def.'s Mem., Ex. 20 (Kim's discovery requests).

In the litigation before this Court, plaintiff is trying to prove that discriminatory intent led DTRA to abuse the certification process. Yet, the decision not to certify plaintiff was a central basis for plaintiff's removal from federal service and therefore the primary focus of the MSPB proceedings. See Kim, 2008 MSPB Lexis 1510, at *9-10 (detailing certification process in general), *11-26 (describing first certification attempt), 30-33 (describing the training program

to prepare plaintiff for another certification attempt), *34-40
(second certification attempt), *41-29 (third certification
attempt).[6] The record clearly shows that plaintiff had ample
opportunity before the MSPB to probe any perceived improprieties
or flaws in the certification process.

Quite simply, this is not a case in which the plaintiff
lacked an opportunity to discover the information he seeks. See
Hamilton v. Geithner, No. 1:08cv1112, 2009 WL 2240358, at *2
(E.D. Va. July 23, 2009)(granting summary judgment in part
because "a lengthy EEO investigation created an extensive record
in which the recollections of witnesses were set down"). Here,
too, there was a lengthy EEO investigation into Kim's
complaints. Although plaintiff maintains that he "engaged in no
discovery when the case was before the EEOC," Pl.'s Opp'n at 23,
the Secretary accurately responds that the EEO investigation
resulted in an extensive ROI. The ROI, which was the basis for
the EEOC's finding of no discrimination or retaliation, includes
thirty exhibits, such as witness affidavits, documents and

---

[6] In the MSPB proceeding, plaintiff advanced many of the same
arguments he relies on in this litigation. See Kim, 2008 MSPB
Lexis 1510, at *11 ("One assertion by the appellant through
adjudication of this appeal was that he was not provided
adequate training."), *49-50 ("[Kim] further argued that there
was no objective standard against which he could be measured
and, accordingly, he asserts that the assessment of his
performance was invalid and improper."); see also id. at *48-49
(observing that plaintiff's criticism of the certification
process and praise for his own performance were "repeatedly
disputed by multiple agency witnesses").

emails, and was estimated by defense counsel at the hearing to be approximately three inches thick. See Def.'s Mem., Ex. 22.

Moreover, plaintiff has not "demonstrated a reasonable expectation that the requested discovery will reveal the existence of a genuine issue of material fact." Hamilton, 2009 WL 2240358, at *2 (denying a request for discovery premised on a "purely speculative hope that the [witnesses and employers] will recant their sworn testimony and reveal a long-running and intricately-planned conspiracy").

The volume of evidence developed during the administrative proceedings and the absence of a reasonable basis for believing that further discovery will reveal the evidence plaintiff hopes exists make summary judgment at this juncture appropriate. For these reasons, defendant's Motion will be considered on its merits.

## B. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248. The Court must view the record in the light most favorable to the nonmoving party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d

124, 132 (4th Cir. 2002). The moving party must initially show the absence of a genuine dispute of material fact, and once it has met its burden, the nonmovant "must come forward and show that a genuine dispute exists." Arrington v. ER Williams, Inc., No. 1:11cv535, 2011 U.S. Dist. LEXIS 144909, at *11-12 (E.D. Va. Dec. 16, 2011)(citing Celotex Corp., 477 U.S. at 325 and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Accordingly, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Liberty Lobby, 477 U.S. at 252. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate. Matsushita, 475 U.S. at 587.

## C. Discrimination

Count II alleges discrimination on the basis of race and national origin, including claims for hostile work environment and disparate treatment. E.g., Compl. ¶¶ 122, 124, 126-27, 131.

20

## 1. Hostile Work Environment

For his hostile work environment claim to survive summary judgment, Kim must show that a reasonable trier of fact could find that Kim was the subject of conduct that was (1) unwelcome, (2) based on race or national origin, (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and (4) that there is some basis for imposing liability on his employer. E.g., Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001)(citing Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).

A careful review of plaintiff's civil complaint, his March 1, 2007 informal complaint to the EEO office, and his April 17, 2007 formal Complaint of Discrimination show that his allegations include:

- Plaintiff was "yelled at" during counseling sessions. Compl. ¶¶ 24-26.
- A co-worker "refer[red] to" plaintiff as a "homosexual" in front of other colleagues, and "the reference to Dr. Kim as a homosexual was because of his race and/or national origin." Compl ¶¶ 35, 64, 67; Def.'s Mem., Ex. 14 at 2.
- Plaintiff's requests to leave early during the second certification attempt were "rejected in an intimidating manner"; specifically, Captain John Murphy ordered Plaintiff to meet him in a storage closet and yelled at him. Compl. ¶¶ 70, 73; see Def.'s Mem., Ex. 14 at 2.
- When plaintiff expressed concern about driving home late, Sheth asked him in front of others, "Why didn't you sleep at one of those cheap quickie places near Belvoir, where they charge by the hour, you have those in Korea." Compl. ¶¶ 76-78; Def.'s Mem., Ex. 14 at 2.

- Sheth yelled at plaintiff, "I will not certify you," during the second certification attempt. Compl. ¶ 81; Def.'s Mem., Ex. 14 at 2.
- Sheth told plaintiff he "stinks" and asked him in front of others why he always wears the same suit. Compl. ¶¶ 83-85; Def.'s Mem., Ex. 14 at 3.
- During a discussion between plaintiff and a co-worker about plaintiff's previous work experience in Iraq, the co-worker asked him whose side he was on in Iraq, which plaintiff "considered . . . highly offensive and racist, because [the words] implied that Dr. Kim favored the enemy because he was born in Korea, rather than in this country." Compl. ¶¶ 88-90; Def.'s Mem., Ex. 14 at 3.
- Plaintiff's supervisors scrutinized his work more than that of his peers. Compl. ¶ 105(j); Def.'s Mem., Ex. 15 at 3.
- "Colonel Sherwood told Dr. Kim multiple times that he had a Korean wife in a manner that indicated that he was bragging about having a trophy." Compl. ¶ 75.

Plaintiff also alleges discrete, unfavorable acts by his

supervisors:

- On February 27, 2007, plaintiff was informed he could not have an EEO representative present during his performance counseling sessions. Compl. ¶ 105(a); Def.'s Mem., Ex. 14 at 3.[7]
- Plaintiff was not certified as a JSIVA SE. Compl. ¶ 105(k); Def.'s Mem., Ex. 14 at 2.

---

[7] Defendant contests the accuracy of several of plaintiff's representations; for example, Captain John Murphy states that the conversation about plaintiff's work hours occurred in a break room, not a storage closet. See, e.g., Def.'s Reply, Ex. 27 (interrogatory answers). With respect to defendant's February 27, 2007 denial of plaintiff's request for EEO support at performance counseling sessions, Captain John Murphy maintains that although plaintiff had "unfettered access" to the EEO office, it would be outside DTRA policy to arrange for the presence of an EEO counselor when a supervisor intended to speak with Kim regarding his job performance. See id.; Def.'s Mem., Ex. 8 at 2. For the purposes of this Motion, however, the facts are viewed in the light most favorable to the non-movant and factual disputes will not be resolved.

- Plaintiff received five negative performance
  counseling memoranda. Compl. ¶ 105(1); Def.'s Mem.,
  Ex. 14 at 2.

Plaintiff's counsel during the administrative proceedings

asserted that "[a]lthough the foregoing are not exhaustive of

each instance or act of the Agency's ongoing acts of

discriminatory harassment directed towards Dr. Kim, they are the

most blatant and severe." Def.'s Mem., Ex. 15 at 4.[8] The

Secretary responds that plaintiff failed to timely exhaust his

hostile work environment claim and cannot, in any event, make

out a prima facie case.

   a. Timely exhaustion of claims

Defendant first argues that plaintiff did not exhaust his

hostile work environment claim. See Def.'s Mem. at 15-17.

Administrative exhaustion is a prerequisite to filing suit under

Title VII, and proper exhaustion requires an aggrieved federal

employee to "initiate contact with [an EEO] counselor within 45

---

[8] Several allegations in the complaint appear to be petty
workplace grievances far outside the scope of a Title VII
action. For example, theorizing that he was set up from the
beginning to fail at DTRA, Kim alleges that he was intentionally
given a printer too small to print his presentation at the first
certification attempt and that a colleague told others that Kim
had "hit" him after Kim accidentally bumped this colleague. He
also alleges that he was provided a camera without a memory card
during a certification attempt and that his engineering tools
were stolen from, and then returned to, their safe to harass
him. With respect to the last two allegations, defendant
responds that plaintiff frequently complained that equipment was
missing or not functional and that these complaints were found
to be either untrue or a problem that should have been solved by
plaintiff himself. See, e.g., Def.'s Reply, Ex. 27.

23

days of the date of the matter alleged to be discriminatory."
29 C.F.R. § 1614.105(a)(1).

Hostile work environment claims are governed by a
"continuing violation" theory, which allows a plaintiff to
recover for harassment that falls outside the 45-day timeliness
period if it is part of a continuing series of conduct, and some
of that conduct was timely alleged. See Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 115-17, 122 (2002)("A charge
alleging a hostile work environment claim . . . will not be time
barred so long as all acts which constitute the claim are part
of the same unlawful employment practice and at least one act
falls within the time period."). Discrete employment acts that
are unrelated to the severely hostile work environment may be
part of a disparate treatment claim but are not properly
considered on a hostile work environment claim. See Chacko v.
Patuxent Inst., 429 F.3d 505, 511 n.2 (4th Cir. 2005); Lester v.
Natsios, 290 F. Supp. 2d 11, 32-33 (D.D.C. 2003) ("Discrete acts
constituting discrimination or retaliation claims . . . are
different in kind from a hostile work environment claim that
must be based on severe and pervasive discriminatory
intimidation or insult.")(citing Morgan, 536 U.S. at 115-16, and

collecting cases).[9]

Defendant correctly argues that no allegations of hostile

work environment fall within the 45-day time period. See Def.'s

Mem. at 11-12, 15-17. Some of the claims identified above allege

disparate treatment or are discrete employment actions not

subject to a hostile work environment claim. With the exception

of plaintiff's highly general assertion that he was "yelled at"

during counseling sessions that became "progressively more

uncomfortable," for which he offers neither factual details nor

evidence, all the other allegations pertain to conduct that

occurred in October and November, 2006, more than three months

before he made his initial contact with the EEO office. On these

facts, plaintiff did not timely exhaust his administrative

remedies.

---

[9] Because the decisions not to certify were independent, discrete
employment acts, they are not a basis for Kim's hostile work
environment claim. See Ze-Ze v. Kaiser Permanente Mid-Atl.
States Regions, Inc., No. 1:10cv959, 2011 WL 320945, at *5 (E.D.
Va. Jan. 28, 2011). Moreover, the first two certification
denials cannot be considered in any event because they were made
outside the 45-day limitations period, and "continuing
violation" theory notwithstanding, "discrete acts of
discrimination cannot be saved by the continuing violation
doctrine . . . . [S]uch discrete acts 'are not actionable if
time-barred, even when they are related to acts alleged in
timely filed charges.'" See id. (quoting Morgan, 536 U.S. at
113); see also Gilliam v. S.C. Dep't of Juvenile Justice, 474
F.3d 134, 141 n.8 (4th Cir. 2007). Plaintiff is therefore
incorrect that "all three certification efforts are properly in
this case." Pl.'s Opp'n at 8.

### b. Plaintiff's prima facie case

Even assuming plaintiff's allegations of hostile work environment were timely, they nevertheless fail because Kim has not proffered any material facts to support a prima facie case of hostile work environment. Specifically, Kim cannot show that the alleged conduct was based on his race or national origin, nor can he demonstrate that it was "severe or pervasive." First, Kim is required to show that the harassing conduct of which he complains was based on, or because of, his race or national origin. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir. 1997)("An employee is harassed or otherwise discriminated against 'because of' his or her sex if, 'but-for' the employee's sex, he or she would not have been the victim of the discrimination."(quoting Wrightson v. Pizza Hut of Am., Inc., 99 F.3d 138, 142 (4th Cir. 1996))). Standing alone, an "insulting or demeaning remark does not create a federal cause of action . . . merely because the 'victim' of the remark happens to belong to a class protected by Title VII." Id.

As defendant correctly points out, plaintiff makes no plausible argument that the alleged harassment pertains whatsoever to his race or national origin.[10] As such, plaintiff

_____

[10] In fact, the only statements containing even a reference to plaintiff's race or national origin are Sheth's alleged suggestion that plaintiff stay at a "cheap, quickie" place in Fort Belvoir and Sherwood's assertion that his wife is Korean.

26

simply cannot satisfy the "based on" prong. See Bhella v. England, 91 F. App'x 835, 845-46 (4th Cir. 2004) (reversing a denial of defendant's motion for judgment where evidence was that a boss "originally hesitated to hire [the plaintiff] because her education and experience were from India" and twice described her as speaking "broken English," and where two colleagues made fun of the plaintiff's accent behind her back; finding that, "[w]hile certainly inappropriate, this evidence is not sufficiently connected to the actions taken against" plaintiff to satisfy the "but for" test).

Second, even if the alleged harassment had been based on plaintiff's protected status, Kim must still establish that the alleged discriminatory conduct was "sufficiently severe or pervasive." A "merely unpleasant" environment will not suffice. Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (citation omitted). The Court of Appeals has elaborated:

> [P]laintiffs must clear a high bar in order to satisfy
> the severe or pervasive test. Workplaces are not
> always harmonious locales, and even incidents that
> would objectively give rise to bruised or wounded

It is far from obvious that Sheth's remark was "based on" plaintiff's national origin; moreover, Sheth's alleged additional assertion that "you have those [cheap, quickie motels] in Korea" was not mentioned in plaintiff's filings with the EEO or MSPB. Compare Def.'s Mem., Exs. 14 & 15 with Compl. ¶ 76. Plaintiff offers no evidence that Sherwood's presumably true statement that his wife is Korean was indicative of "bragging" or was, in any event, harassment. Finally, Kim offers no support for his attenuated claim that a question as to "whose side" he was on in Iraq was based on race or national origin.

> feelings will not on that account satisfy the severe
> or pervasive standard. Some rolling with the punches
> is a fact of workplace life. Thus, complaints premised
> on nothing more than "rude treatment by [coworkers],"
> Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006),
> "callous behavior by [one's] superiors," Bass v. E.I.
> DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.
> 2003), or "a routine difference of opinion and
> personality conflict with [one's] supervisor," Hawkins
> v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000),
> are not actionable under Title VII.

EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir.

2008)(alterations in original). A plaintiff must show that the

"work environment was not only subjectively hostile, but also

objectively so." Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir.

2011). Relevant factors in determining whether a work

environment is objectively hostile include the "frequency of the

discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work

performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-

88 (1998)(internal quotation marks omitted).

Plaintiff has introduced no evidence satisfying the

Faragher factors. The alleged comments cannot be reasonably

characterized as severe, nor were they frequent. Compare Jordan

v. Alt. Res. Corp., 458 F.3d 332, 342 (4th Cir. 2006)(holding

that egregious racial slur did not satisfy "severe and

pervasive" prong because "there is a difference between an

isolated racial slur, which is always and everywhere

inappropriate, and the sort of severe or pervasive conduct that creates a hostile work environment"), and Hartsell, 123 F.3d at 773 (holding that four offensive, gender-based comments by several males did not satisfy "severe and pervasive" prong), with Sunbelt Rentals, Inc., 521 F.3d at 310-313, 316 (finding "severe and pervasive" prong met where plaintiff suffered harassment that was "persistent, demeaning, unrelenting, and widespread").

None of plaintiff's allegations rises to the level of frequent, severe, or physically threatening harassment. Although the conduct described by plaintiff may have been subjectively "humiliating," that alone cannot sustain his claim. The alleged conduct is more appropriately characterized as "mere" offensive or annoying utterances from co-workers.

Because plaintiff cannot point to any facts that could establish a prima facie case of hostile work environment, defendant is entitled to summary judgment on this claim.

### 2. Disparate Treatment

Plaintiff alleges that he was subjected to disparate treatment when he was not certified and when his work was more harshly scrutinized than that of his colleagues. Where, as here, a plaintiff has no direct proof of unlawful discrimination, he must satisfy the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Specifically, to carry his

initial burden, the plaintiff must make out a prima facie case

of discrimination. Id. at 802. If he does so, the burden shifts

to the defendant to articulate legitimate, nondiscriminatory

reasons for the adverse employment decision, whereupon the

plaintiff must overcome defendant's non-discriminatory reasons

by proving by a preponderance of the evidence that those

"reasons" were a pretext for discrimination. See id. at 802-04;

Hux v. City of Newport News, Va., 451 F.3d 311, 314-15 (4th Cir.

2006).

### a. Plaintiff's prima facie case

To make out a prima facie case of disparate treatment, Kim

must establish that he (1) is a member of a protected class;

(2) performed satisfactorily in his job; (3) suffered an adverse

employment action; and (4) was treated less favorably than

similarly-situated employees outside the protected class. See,

e.g., Gerner v. Cnty. of Chesterfield, 674 F.3d 264, 266 (4th

Cir. 2012). Kim cannot make out this prima facie case.

Specifically, he cannot show that his performance was

satisfactory or that similarly-situated non-Asian employees

received more favorable treatment.

The record amply demonstrates that plaintiff had not

performed in a satisfactory manner. Starting as early as mid-

August 2006, about six weeks after plaintiff began working at

DTRA, his work style and product were generating criticism. His

first trainer, Hudson, commented that Kim blamed others after he arrived at training without the right tools, failed to manage his time well, skipped certain analytical steps, and was generally unengaged and unprepared to conduct and discuss assessments. See Def.'s Mem., Ex. 7 (email from Hudson to Captain John Murphy). Moreover, rather than accepting criticism, defendant became defensive and verbally attacked Hudson. Id. As such, Hudson did not recommend plaintiff to be certified and the team chief, Vaughan, concurred. See Pl.'s Opp'n, Ex. 17. Afterwards, these two men along with Andrews conducted a counseling session with Kim on August 21, 2006 to discuss where he went wrong.

On August 23, 2006, plaintiff received his first performance counseling memorandum, which discussed the "shortfalls" that had prevented his certification and deemed his work to that point "unsatisfactory." Plaintiff was put into remedial, one-on-one training in Florida from September 18 to 22, 2006 and at Fort Belvoir from October 1 to 6, 2006. During this training, plaintiff shadowed a JSIVA assessment performed by Sheth. Sheth documented numerous criticisms of plaintiff's performance, including that he lacked team skills, was unprepared and unfocused, and showed poor time management.

Def.'s Mem., Ex. 1 at 31-32.[11]

Throughout his employment, managers expressed concern that plaintiff was not meeting the objectives detailed in his July 7, 2006 Performance Plan. For example, he did not become certified by September 2006, which was his first objective. See id. at 16-17. In fact, defendant maintains that other SEs became certified after a single attempt and that in no instance had an SE required three attempts at certification. Plaintiff's second objective was to be "capable of explaining each observation to the team chief in order to deliver a professional and competent outbrief of assessment results." Id. at 16. Despite this clear requirement, every person who reviewed Kim commented on his inability to clearly convey information, noting that he became hung up on small technical details and lost the forest for the trees, ventured into tangents during his presentations, and focused on hyper-technical details while leaving out significant information.

Top supervisors also expressed concern that Kim was not presenting the right image of a DTRA SE. In his MSPB testimony, McCarthy explained that an SE must be able to go to an

---

[11] Despite Sheth's numerous criticisms of plaintiff's performance and Kim's allegations that Sheth subjected him to a hostile work environment, Sheth's qualified recommendation to certify plaintiff after the second certification attempt is the entire basis for plaintiff's claim that he should have been certified. See, e.g., Def.'s Reply at 8 n.5.

32

installation, assess the situation, and gain immediate
credibility with the local DOD employees who run the
installation. He testified that DTRA expects its SEs to command
attention and win the confidence of non-technical staff. Yet
criticisms of Kim included his poor communication style,
defensiveness, poor posture, inattention, disinterested
demeanor, and unprofessional appearance. With respect to the
last issue, Kim was advised that it was inappropriate that he
wore the same highly stained suit every day and that his hygiene
and general appearance were not adequate.

　　Plaintiff emphasizes his previous work as an SE with PFPA;
however, he cites no support for the proposition that
satisfactory performance in one position can establish good
performance in a subsequent job with a different employer. See
Baqir v. Principi, 434 F.3d 733, 743 (4th Cir. 2006)(rejecting
argument that credentials and recommendations from previous
employer were evidence sufficient to create a genuine issue of
fact on the performance element of the prima facie case).
Moreover, although plaintiff describes his position with PFPA as
virtually the same job as the one he was hired to do for DTRA,
defendant quotes from the stated objectives of both job
descriptions to contrast the skills necessary for each position;
specifically, the DTRA position clearly required skills beyond
just technical ones. Compare Pl.'s Opp'n, Ex. 22, with Def.'s

Mem., Ex. 1 at 16-17.[12] In any event, Kim's performance with PFPA cannot defeat summary judgment here.

In the face of all the evidence concerning plaintiff's inadequate performance, his sole basis for arguing that he performed satisfactorily is his own self-evaluation. See, e.g., Pl.'s Opp'n, Ex. 4 at 24:13-15 (MSPB testimony)("I performed, yes, I performed, regardless of how [sic] other people say and do."). This is insufficient as a matter of law. See Evans, 80 F.3d at 960 ("[Plaintiff's] unsubstantiated allegations and bald assertions concerning her own qualifications and the shortcomings of her co-workers fail to disprove [defendant]'s explanation or show discrimination.")(citations omitted).

Even had plaintiff successfully satisfied the performance element of the prima facie case, he has produced no evidence that any similarly-situated, non-Asian/Korean employee was treated more favorably than he was. This issue was directly considered by the MSPB:

> The appellant concedes that all of these Structural Engineers were certified but he contends that the agency's failure to certify him and the agency's action of removing him were the result of prohibited discrimination. . . . [T]he appellant presented no

---

[12] Plaintiff argues that his performance review with PFPA stated that he had performed "exceptionally" in the completion of the anti-terrorism assessments he was assigned. See Pl.'s Mem., Ex. 22 at 3. Defendant disputes that plaintiff's review was as strong as he characterizes considering his overall performance was determined to be "acceptable" and that he was given an overall rank of a "3" on a 1-5 scale. Id.

evidence to support his allegation. None of the
Structural Engineers at issue failed to achieve
certification after three attempts and after all of
the training and counseling provided to the appellant.
The appellant presented no evidence that he was
treated differently based on his race and national
origin. Further, while the appellant is Korean and has
a foreign accent, it is undisputed that other
Structural Engineers within the agency are foreign
born and have an accent but were granted certification
by the agency upon demonstrations of acceptable
performance. For instance, Mr. Sheth testified that he
was born in India and still had an accent. It is
undisputed that Mr. Sheth was certified and attained
the status of a Senior Instructor for new engineers.
In sum, the appellant failed to present preponderant
evidence that the agency's action to deny
certification or remove him for unacceptable
performance was the result of prohibited
discrimination.

See Kim, 2008 MSPB Lexis 1510, at *57-58.

Because plaintiff offers no facts to establish that he

satisfactorily performed his job and does not point to a single

similarly-situated employee who was treated in a more favorable

manner, he is unable to establish a prima facie case of

disparate treatment and thereby carry his initial evidentiary

burden.

### b. The Secretary's legitimate reasons and absence of pretext

Even if plaintiff could establish a prima facie case of

discrimination to trigger burden-shifting, the Secretary's

legitimate, non-discriminatory reasons for the adverse actions

taken with respect to plaintiff are fully supported by the

evidence. Many of these well-documented reasons are discussed

above in connection with the performance element of the prima
facie case.

In the face of defendant's reasons, plaintiff fails to
offer a single piece of evidence showing that defendant's
grounds for removal were a pretext to hide discriminatory
intent. Plaintiff argues that the certification process was a
"sham" and improperly handled because Sheth's recommendation was
vetoed and because unqualified individuals, specifically Hudson
and DiSalvo, led the trainings and certifications. Plaintiff's
argument about irregularities in the process is unsupported by
the DTRA's Operations (Training) Standard Operating Procedures
("SOP") that he cites. In particular, the SOP provides:

> "Training is a team effort; all division personnel
> must take an active role to ensure training provided
> is meaningful and valuable." Pl.'s Opp'n, Ex. 5, SOP
> 4.
>
> "After both assessments are successfully completed,
> assuming no reservations from the trainer and the
> assessment team chief, the candidate will be certified
> by the Functional Group Leader." Id., SOP 5(e)(3)
> (emphasis added).
>
> "The applicable branch chief and division or deputy
> division chief will determine if remedial training or
> other actions are appropriate for those new employees
> who do not satisfactorily complete the certification
> training." Id., SOP 5(e)(3).

Clearly, these passages do not advance Kim's argument that the
certification process was abused here; rather, the SOP appears
to contemplate the procedures, such as input from senior

36

officials, about which he complains.

The contemporaneous emails appended to plaintiff's Opposition demonstrate that numerous senior officials within DTRA were involved in reviewing Kim's performance from the outset. Although plaintiff quotes these same emails in an effort to show racial bias, they show no such thing. In fact, these communications bolster the Secretary's position that individuals within the DOD were expending significant resources to assist plaintiff to become certified and to succeed as an SE. For example, senior officials were engaged in ongoing discussions over plaintiff's certification because "[t]here have been lots of issues mentioned." See id., Ex. 15. Despite these issues, DTRA was still committed to working with Kim because Sherwood had "a number of items planned (training, counseling, follow-up) to address the problems." Id.; see id., Ex. 12 (email from Captain John Murphy discussing Kim's problems, whether he might succeed under other trainers, and whether observing another assessment might "round out his tool bag").

Another email on which plaintiff heavily relies expresses concern that Kim does not have the proper "cultural buy in." See id., Ex 7. In that correspondence, team chief McCarthy informed Captain John Murphy, who wished to know where Kim was in the qualification process for staffing purposes, that "Dr. Kim was still not able to function as an SE" and that "Ramesh had to

step in constantly" to either supplement or correct plaintiff's presentations. Id. "Ramesh and I talked. He feels Dr. Kim is capable of being certified, but he still has some way to go. I think the effort level and a buy in to our culture is what is holding him back." Id. In the context of the email, the culture he refers to is clearly the DTRA culture. See Def.'s Reply, Ex. 26 (McCarthy's deposition testimony).

Plaintiff also offers an email from Colonel Jim Murphy stating that Kim "is not a very good speaker, English skills are very weak (especially when he is on the spot)." Pl.'s Opp'n, Ex. 8. Plaintiff argues that the email proves that DTRA was using a discriminatory, vague, ad hoc English proficiency test. This argument carries no weight. The email was written as an evaluation of Kim's overall performance during training, which included a question and answer session. Moreover, any concerns about poor communication abilities were appropriate given that the SE job description and plaintiff's second Performance Plan objective required such skills. See Def.'s Mem., Ex. 1 at 12, 16; see also infra at 31-32. The consistent feedback on plaintiff's performance, including his refusal to listen, his inability to give cogent responses to questions, and his overly technical presentations, which were not fully comprehensible to non-engineers, demonstrates that he had a broad communication problem that went beyond his language proficiency.

Finally, plaintiff argues that the certification process was abused because Andrews initially told him that he had been certified on his second attempt. Attempting to portray the apparent miscommunication between Andrews and other senior officials as nefarious, plaintiff points to an email in which Captain John Murphy writes to McCarthy that, "[t]ime isn't on our side considering Sung has already been under the impression he is certified." Pl.'s Opp'n, Ex. 15. It is clear from the context of the email that the managers were all still deliberating whether Kim's performance, which was rated as a "C" even with substantial assistance by Sheth, qualified him for certification. See id., Ex. 8 ("[Kim] did ok, not great, but not terrible either. Overall a 'C.'").[13] This evidence simply does not establish that the DTRA's decision not to certify plaintiff was a pretext for discrimination.

All the evidence, and particularly the contemporaneous emails, shows that DTRA went to great lengths to help Kim succeed despite the resources that had to be expended during three certification attempts, weeks of additional remedial training, and numerous performance counseling meetings. In light of these facts, plaintiff cannot overcome defendant's non-discriminatory reasons for the DTRA's adverse employment

---

[13] Kim's argument that emails indicating he was a "C" performer prove that he should have been certified or that he turned in a satisfactory work performance are without merit.

39

actions, and the Secretary is entitled to summary judgment on the disparate treatment claim.

## D. Retaliation

Finally, plaintiff contends that he was retaliated against because of his EEO activity. To establish a prima facie retaliation case, Kim must show that: (1) he engaged in protected activity; (2) the Secretary acted adversely against him; and (3) that adverse action was causally connected to the protected activity. E.g., Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). If the prima facie case is established, the defendant must proffer a legitimate, non-retaliatory reason for the adverse action; if the defendant does so, the plaintiff must show that the non-retaliatory reason offered is pretextual. See Laber v. Harvey, 438 F.3d 404, 432 (4th Cir. 2006)(citation omitted).

Kim cannot establish a prima facie case because there is no evidence of a causal connection between his protected activity and the adverse employment actions taken.[14] As an initial matter,

---

[14] The Court assumes for the purposes of the Motion that the second and third refusals to certify Kim and the decision to terminate his employment constitute adverse employment actions. Whether negative performance counseling memoranda would also qualify is an open question in this circuit that need not be resolved here given that plaintiff cannot establish causality or rebut the Secretary's non-retaliatory basis for the adverse actions. See Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008)(declining to resolve what constitutes adverse employment action for a federal employee alleging retaliation); Linzer v.

the parties dispute when plaintiff first engaged in protected activity. Compare Def.'s Mem. at 26-28, and Def.'s Reply at 14-15, with Pl.'s Opp'n at 20-21. Plaintiff maintains that his alleged oral requests on August 23, 2006, December 27, 2006, and February 21, 2007 to have an EEO counselor present at his performance counseling sessions constituted protected activity. Defendant argues that Kim did not engage in protected activity before March 1, 2007, when he lodged his informal EEO complaint, because Kim himself did not possess a reasonable belief before that date that he was the victim of discriminatory conduct.

Plaintiff's assertion that he engaged in protected activity in 2006 is problematic. In an affidavit created for this case, plaintiff states that during the August 23, 2006 counseling session with Sherwood and Captain John Murphy, he verbally "requested that someone . . . diddling [sic] with discrimination complaints attend the meeting" and that when he was asked why he wanted such a person present, he "replied that [he] felt discriminated against or words to that effect." Pl.'s Opp'n, Ex. 2 ¶ 16. He alleges that he made the same request during his December 27, 2006 and February 21, 2007 sessions. Id. ¶ 19; Pl.'s Opp'n at 9.

_____

Sebelius, No. 07-0597, 2009 WL 2778269, at *5 n.3 (D. Md. Aug. 28, 2009)(same), aff'd, 378 F. App'x 357 (4th Cir. 2010).

Several pieces of evidence cast doubt on the accuracy of Kim's affidavit. Namely, in neither his informal EEO complaint nor his formal Complaint of Discrimination did plaintiff mention these requests for EEO office assistance.[15] If Kim did in fact request EEO assistance in August 2006, his MSPB testimony directly contradicts the assertion in his affidavit that he contemporaneously possessed or expressed a belief that he was the victim of discrimination. For example, when Kim was asked whether he had ever told Sherwood and Captain John Murphy that he felt he was being treated unfairly, plaintiff admitted that he had "[n]ot [in] too many words. I was under stress . . . ." Id., Ex. 4 at 9:22-10:2 ("I was afraid to even say that . . . ."). During cross-examination, plaintiff testified that in August 2006, Sherwood and Captain John Murphy "were giving me an official counseling memo which I was told to read and sign. My thoughts were you don't sign anything just out of nowhere. It was not what I would consider a good counseling memo, so I asked them. I'd like to have an EEO person present." Id. at 20:16-23.

The reasonable inference from this evidence is that in the time period between August 2006 and early February 2007,

---

[15] He did, however, allege in both EEO filings that he asked for EEO assistance on February 27, 2007. See Def.'s Mem., Exs. 14 & 15; see also id., Ex. 8 (email exchange between Kim and Captain John Murphy seven days after plaintiff wrote on his February 20, 2007 performance counseling memorandum that he wanted EEO representation at future performance meetings).

plaintiff did not believe himself to be a victim of Title VII discrimination and therefore could not have engaged in protected activity. This inference is further supported by Kim's initial interaction with the EEO counselor on February 16, 2007.[16] As described in the counselor's affidavit, Kim stated that he "felt [the personnel issue] may be a hostile work environment issue or a cultural issue, as in military v. civilian." Def.'s Mem., Ex. 12. After the counselor explained to plaintiff the only bases on which an employee could file a discrimination complaint under the EEO regulations, "Dr. Kim was not sure if any of the bases were applicable . . . ." Id.

Protected activity does not include generalized employment-related complaints unrelated to Title VII-prohibited discrimination. See, e.g., White v. Rice, 46 F.3d 1130, at *4 (table) (4th Cir. 1995) (per curiam) ("[Plaintiff's] contention that his generalized verbal complaints to co-workers and supervisors constituted protected activity . . . lacks merit. Such comments are distinguishable from cases where informal

_____

[16] Because there is no evidence that Kim's supervisors knew about the February 16, 2007 meeting, it could not have been the cause of any adverse employment action. See, e.g., Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998) ("[T]he employer must have taken the adverse employment action because the plaintiff engaged in a protected activity. Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.") (emphasis added).

opposition to an employer's actions was considered protected activity under Title VII."); Revis v. Dyncorp Tech. Servs., Inc., 292 F. Supp. 2d 733, 737 (D. Md. 2003). The record therefore strongly supports the Secretary's position that plaintiff did not engage in protected, oppositional activity until March 1, 2001.

Giving plaintiff the benefit of the doubt, however, the Court will assume arguendo that Kim made a verbal request for EEO assistance on August 23, 2006 that sufficiently put the DTRA on notice of the nature of Kim's complaint. Plaintiff's retaliation claim nevertheless fails because he cannot establish a causal connection between this assumed protected activity and any materially adverse employment action. The evidence amply demonstrates that each alleged adverse action of which plaintiff complains – the negative counseling memoranda, denials of certification, and his ultimate termination – were tied to specific performance-related problems, most of which had been identified before August 23, 2006.

Specifically, plaintiff's inadequate performance had already resulted in the denial of his first certification attempt in Germany, Hudson's lengthy email outlining his highly unfavorable critique of Kim, a counseling session on August 21, 2006, and the critical August 23, 2006 performance counseling memorandum detailing Kim's deficiencies. As discussed above, the

44

August 23, 2006 memorandum cited lack of preparation, awareness, engagement, attention to detail, adaptiveness, time management, and proper prioritization as "[s]ome of the shortfalls" supervisors had observed. Def.'s Mem., Ex. 1 at 28. The memorandum went on to note Kim's inadequate research and analysis, failure to use the right tools and methodology, tendency to interrupt and "disregard [people] out of hand," and unwillingness to accept feedback and direction, which appeared to stem from "an attitude that your agenda or preferences are of higher priority than anyone else's, including that of your supervisor during a counseling session." Id. at 28-29. These performance problems, observed before August 23, 2006, continued through his termination, as reflected in the successive memoranda that addressed largely the same behavior by plaintiff.

Plaintiff's only evidence as to the causation prong of the prima facie case is the temporal proximity between his protected activity and the subsequent adverse employment actions. This evidence does not create a triable issue on causality because "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." Brown v. Ill. Dep't of Nat. Res., 499 F.3d 675, 685 (7th Cir. 2007)(citations omitted)(finding no causal connection where plaintiff had been receiving "negative reviews and client complaints prior to his first discrimination complaint").

Given that his performance issues were well-documented before he engaged in any protected activity, plaintiff's position is simply not credible on this record. After all, employees "are shielded from retaliation on account of their assertion of rights protected under Title VII. But a complaining worker is not thereby insulated from the consequences of insubordination or poor performance." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008)("[Plaintiff] claims that the letter of reprimand she received . . . was sent in retaliation for her claims of sexual harassment. But the record reflects that the reprimand was issued because of [her] repeated abuse of her sick leave in order to avoid having to work full-time despite the cancellation of part-time schedules.").

Even were Kim able to make out a prima facie case of retaliation, he cannot overcome the Secretary's legitimate, non-retaliatory reasons for the adverse employment actions taken. As found by the MSPB and discussed above, Kim failed to produce a single piece of evidence suggesting that the reasons defendant gave for its adverse employment actions were pretextual. In fact, the evidence shows that defendant invested substantial time and resources to try to keep plaintiff on as an SE but that his consistently inadequate performance, not a discriminatory or retaliatory motive, led to the certification denials and his removal from service with the DTRA. For all these reasons,

46

summary judgment is appropriate on plaintiff's retaliation claim.

### III.    CONCLUSION

For the above-stated reasons, the Court finds that on this well-developed record, there are no material facts in dispute to support plaintiff's allegations of discrimination and retaliation in violation of Title VII, and therefore, the Secretary is entitled to summary judgment.

Entered this $\underline{21}^{\text{st}}$ day of August, 2012.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge